Good morning, your honors. May it please the court. My name is Scott McIntosh. I'm appearing on behalf of the United States. I'd like to reserve five minutes of my time for rebuttal. Just keep your voice up, okay? Yes, your honor. The district court in this case has held that two provisions of FISA, 50 U.S.C. 1804 and 1823, are facially unconstitutional under the Fourth Amendment. That decision is incorrect for two primary reasons. First, the district court itself lacked jurisdiction to enter that judgment because the plaintiffs have no standing. And second, taken on its own terms, the decision misapprehends the appropriate Fourth Amendment standards that govern foreign intelligence surveillance. I'd like to begin with the standing issue and then turn to the merits. The district court held that the plaintiffs are suffering an injury because the government possesses the so-called derivative FISA materials. The injury perceived by the district court is not based on any apprehension about how the government might use those materials or whether the government will use them. The district court regarded their possession alone as being an Article III injury. Even if that's true, the problem in terms of standing is that there is no redressability for that injury. As you know, the complaint in this case and the settlement agreement that preceded it confined the district court to only one possible remedy, namely the declaratory judgment that it entered, a declaration of facial unconstitutionality. That was clearly a bargain for remedy? Absolutely, Your Honor. I mean, one thing that's important to keep in mind in general in this case when you look at the complaint and what's being sought in the complaint is that the complaint itself, unlike any other one I've ever seen, is itself the product of a bargain. It's part of the settlement agreement. Its terms were bargained for. And so the limitations in the complaint itself in terms of what the claim is and what relief was being sought is part of the bargain for remedy. So the only relief the court could enter here was a declaratory judgment, and the only declaration was a declaration that these provisions are facially unconstitutional. The problem from the plaintiff's standpoint is that declaration does not obligate the government to destroy, otherwise divest itself of the derivative FISA materials. So how would the government view such a judgment? Pardon me, Your Honor? How would the government view such a judgment? That is, it's just a document from the court that says the statute's unconstitutional? Well, no. Will it prompt the government to take any action? Well, under the terms of the agreement, the settlement agreement itself, a declaratory judgment to that effect would mean that the government could not use those provisions in the future against the Mayfields. Now, that's of no real-world consequence because there's no prospect that that would happen in any event. But in terms of the agreement itself, that's the only consequence. What it doesn't do is obligate the government to dispense with the derivative materials. And, in fact, if you look at the agreement, the settlement agreement, it distinguishes very clearly between what the government has to do with the FISA take on the one hand and what it has to do with the FISA derivative materials on the other. The agreement spells out very specifically that while the government is undertaking to destroy the FISA take, it is not undertaking to get rid of the derivative FISA materials. I guess that means that the government intends to retain the derivative material. That's correct, Your Honor. And is that perfectly permissible under FISA? Yes, Your Honor. There's nothing in FISA that would require the government to get rid of the materials.  Well, the FISA allowed us to acquire the materials. And having acquired them, there's nothing in it that would require us to divest ourselves of them. So there's no affirmative provision saying you can keep it. I guess another way to think about it is FISA has minimization procedures. And those procedures themselves focus not on derivative materials in general but on the actual immediate take. So FISA may place limits on what the government can do with the take, but it doesn't place limits on what the government can do with derivative things that are derived from the take. And as this Court itself has held in cases like Grimes and Ramsden, even when materials are acquired unconstitutionally, that doesn't mean the government is obligated to give them up or to give up copies of them at the end of the day. And so the bottom line here is that the only redress that the plaintiffs could hope for is redress they're not going to get and that this judgment doesn't get them. And that should bring an end to the jurisdictional inquiry here and an end to this case. Now, if the Court were to decide that there were jurisdiction and to go on to the merits, in 2001, as part of the Patriot Act, FISA was amended to adopt a significant purpose test. Prior to that, every court which had considered FISA had held that its standards, its requirements, its procedures complied with the Fourth Amendment and satisfied the special Fourth Amendment requirements that apply to foreign intelligence surveillance. That's what the statute referred to. They referred to the purpose. It referred to the purpose, Your Honor. It had never been construed in that literal sense to mean the purpose. Some courts, as you're aware, had engrafted onto it or read into it a so-called primary purpose test, starting with the Fourth Circuit's decision in Tron. And Congress changed that to significant purpose. The district court thought that in doing so, Congress had crossed a constitutional line and had transformed FISA from a device for seeking out foreign intelligence information into a means of pursuing ordinary crime and that, therefore, conventional Fourth Amendment standards should apply. That was incorrect. To explain why, let me walk through the statute a little bit. And let me talk about what the government can do and what it can't do by virtue of the significant purpose standard. One thing it can't do is use FISA when the primary purpose of the investigation, of the surveillance, is to pursue a non-foreign intelligence crime, a so-called ordinary crime. That's what the FISA Court of Review held in the sealed case. That decision is binding on the government. It controls every FISA application we file. So right off the bat, the government is confined to so-called foreign intelligence crimes. Even as to that much smaller universe of foreign intelligence crimes, the government has to have a significant purpose in addition to, above and beyond, any prosecutorial purpose that it may have in mind. And the prosecution itself, or the prospect of a prosecution itself, is typically going to be simply a means to a broader, non-criminal foreign intelligence end. The government may bring a prosecution against someone based on FISA surveillance, not with the view of accomplishing the conventional criminal goals of punishment, retribution, but in order, for example, to extract additional information, which can be used in other ways, which can be used for technical measures, security measures. The government may use the prosecution as a predicate for pursuing diplomatic measures or even military measures. The point is that when the government's engaged in surveillance under FISA, it is as true today as it was before 2001 that the programmatic goals of the surveillance are not criminal. They look to non-criminal concerns and non-criminal foreign intelligence ends. And that's why this case remains on the – Doesn't the change, though, to significant purpose allow the government, though, to also focus on criminal concerns? Well, it certainly allows the government to – in the sense of being able to prosecute someone. But of course, that's always been true. It's been true since 1978 that the government can use evidence of crime that comes out of FISA surveillance to bring a prosecution. But what's significant is that what the government can't do is use FISA, as the district court, I think, feared, as an end run around the requirements of Title III. It can't use it as a sort of general engine for pursuing criminal prosecutions. And in those – as I say, in those instances where there is a criminal prosecution in mind, it's going to be a foreign intelligence crime only. It's going to be typically a means to a non-criminal end. And it's important to bear in mind, too, that when we're talking about United States persons, and that's all we're talking about in this case, that FISA itself builds into its own definition of agent of foreign power something very much akin, or actually really equivalent, to ordinary Fourth Amendment probable cause. In order to establish that a United States person is an agent of a foreign power, the government has to show that, in essence, that one or more of the enumerated crimes or categories of crimes in the definition of agent of foreign power are being committed by that person. How does that equate to probable cause? Well, in other words, Your Honor, let's assume that the target is a United States person. We might have a case where that person is believed to be engaging in sabotage on behalf of a foreign power. That would be one of the statutory predicates. That would be one of the hooks that would make someone, a United States person, an agent of a foreign power under the statute. When the FISA court comes to the point where it has to make its probable cause determination, it has to find probable cause to believe, among other things, that the target is an agent of a foreign power. And so in that instance, that determination, is this person an agent of a foreign power, is going to require the FISA court to decide whether the person is, there's probable cause to believe they are engaging in sabotage on behalf of a foreign power. So, too, if you look at the definitions of international terrorism, they are tied very directly into criminal acts, acts which are crimes within the United States, or state crimes, or things that would be crimes if they happened here. Essentially, the definition of agent of foreign power, that is, as to which there has to be probable cause, is shot through with essentially cross-references to underlying federal predicate crimes. So that's why, as a practical matter, when you're talking about surveillance of a United States person, the probable cause determination that FISA requires is tantamount to a conventional showing that the person being surveilled is engaging in criminal activity. So what was Congress up to when they changed this? Well, Your Honor. Made this slight revision. Well, here's the answer, Your Honor. I've been searching for the answer, so you can help me. All right. When Congress, let me back up. When courts began in the early 1980s, actually 1980 with Tron, to engraft this primary purpose test under the statute, the way they implemented it was to look, essentially, engage in a kind of organizational chart inquiry. They would look into the investigation and say, whose hands are on the wheel here? Is it the criminal division? Is it the FBI? To what extent is the criminal division? The prosecutors seem to be making calls here. It started to place an enormous premium on maintaining distance between law enforcement personnel within the Justice Department and counterintelligence and counterterrorism personnel. It's one of the primary drivers that led to the creation over the next 10, 15 years, of what came to be called the wall between criminal law enforcement efforts in the Justice Department and counterintelligence and counterterrorism. The government was in a position where if it allowed too much back and forth, too much give and take, too much involvement and participation by law enforcement personnel and prosecutors in a FISA surveillance or more general surveillance of that sort, it was in a position where it could be found to have crossed that line and suddenly FISA wasn't available anymore and the FISA surveillance itself might be held to be unlawful or unconstitutional. So when Congress passed this in 2001, it was part of Congress's effort to take down the wall, to allow greater coordination between these two halves of the Justice Department and two halves of the foreign intelligence community because we paid an enormous price in not being able to have that kind of cooperation. Are you suggesting that the addition of the word significant really is of no constitutional significance? Well, it has no constitutional significance in the sense that it doesn't raise the bar under the Fourth Amendment. It has practical significance to the government because if one were to move back to a primary purpose test, it creates that hydraulic pressure to separate out these functions that's so detrimental to foreign intelligence surveillance. There's also another practical reason for moving in the direction that Congress moved,  It's often difficult as a real-world matter to figure out what the primary purpose is. You may well expect to get evidence of a crime. You almost invariably expect to get other kinds of evidence that are highly significant foreign intelligence information. Identifying what the primary purpose is can be difficult, can be arbitrary, and it's a recognition, I think, on the part of Congress that as long as there is a significant purpose to what the surveillance is aimed at, beyond just a criminal prosecution, there's no purpose to be certain, pardon the word. There's no reason for the government to have to parse it any more finely and say, is this 51-49 or 49-51, that that's not a constitutionally significant difference and there's no reason to have the use of FISA turn on that distinction. One last area that you raised in your briefs, which is, we're down to a facial challenge. Yes, Your Honor. And you argued Salerno. Yes. That they can't show that in every instance the statutes, these statutes are inconstitutional. That's correct, Your Honor. I'm sorry. Just press that for me for just a moment. Certainly, Your Honor. I mean, it's absolutely clear, and I didn't bother bringing these to the Court's attention because they're just more of the same, but this Court has issued further decisions just in the past year that have applied Salerno. In order for the plaintiffs to prevail, they would have to show not only that the government has to meet a heightened, a higher probable cause standard than what you find in the statute in a particular case, but in every case. And the problem for them here is that, as we discussed, particularly when a United States person is involved, showing probable cause to believe that the person is an agent of foreign power is going to be probable cause to believe they're engaged in a criminal activity. Now, that won't be true in every case, but it will be true in a great number of cases. And that's enough in and of itself to take this out of the realm of facial challenges. If you find yourself, if one finds oneself trying to think through hypotheticals, would it be okay here? Would it be constitutional in this circumstance or that circumstance? You don't want to speculate too far. I'm sorry? You don't want to speculate too far. Well, no. We can't engage in speculation about what the government might encounter and may not encounter. Well, that's exactly right, Your Honor. And that's the – I mean, the Fourth Amendment in particular is a sort of context-specific – I'm going to back up. The reasonableness standard in the Fourth Amendment tends to depend heavily on the context of the particular search or seizure. And that is another reason why it doesn't matter. It's clear under the revision brought by the Patriot Act that the government would never have to show a primary purpose. Yes, that's correct, Your Honor. It's just a significant point. In no instance. No, that's correct, Your Honor. But it's not – the constitutional concern of the district court isn't that a significant – that having a primary criminal purpose is somehow unconstitutional in and of itself. The notion is when that's your purpose, then we're in the world of ordinary criminal law enforcement, and then you need to meet conventional probable cause standards. And what we're saying is that in many instances, the statute itself will generate those – that kind of a showing. Did you want to say something else? I'm going to say the rest of my time. Can I ask one more question? Sure. Can I go back to jurisdiction for just a second? Are you saying that the plaintiff in this case bargained away jurisdiction or his standing or never had it in the first place? Well, at the – the plaintiff undoubtedly had standing to pursue certain kinds of relief, for example, damages. But, of course, there was a $2 million payment as part of the settlement here. What Supreme Court has held is that you have to establish standing on a sort of claim-by-claim and, you know, injury-by-injury, relief-by-relief basis. The consequence of the settlement agreement is it eliminated – when you look at the claim that's left and the relief that's left, there's no longer any standing because there's no longer any room for any remedy for the sole remaining injury. Thank you, Your Honor. May it please the Court, Elden Rosenthal, for the plaintiffs. Your Honors, for the first time in the history of our nation since the Bill of Rights was adopted in 1791, the Federal Government can, under the amendments to FISA, for the purpose of building a criminal case, invade the privacy of one's home, the privacy of a law office, and can eavesdrop both in a home, an office, a motel, anywhere that a target can be found. The challenged amendments to FISA, Your Honors, are revolutionary in their sweep. The betrayal of the Bill of Rights contained in these amendments threatens to historically alter our understanding of the Fourth Amendment. What happened to Brandon Mayfield and his family is a direct result of the amendments challenged here, for in the process of attempting to build a criminal case against Mr. Mayfield, the Federal Government put him squarely in its crosshairs, performed covert searches of his home, looked at his client's files, put electronic surveillance on his home and on his law office. Counsel, is it your position that there was no foreign intelligence purpose? I have no idea, Your Honor, because I have not been allowed to see the FISA warrants. What I do know is that the government has stipulated that it did not state in its application for its FISA warrants that its primary purpose was intelligence gathering. That was part of the settlement, Your Honor. The government did not present to the FISC court a statement that our primary purpose is gathering intelligence. Was there any indication as to whether or not there was a statement that it was a significant purpose? Yes. The stipulation of fact says that's what they represented. So then the argument is whether or not a significant purpose as opposed to primary purpose complies with the Constitution? Exactly, Your Honor. I would like to talk about redressability right out of the bat. Let me ask you a question along those lines, I guess it would be. You start off by noting what happened to Mr. Mayfield, which is quite significant. I've read all the background. But the case was settled. And what we're left with is a facial challenge. To what extent do, you know, the circumstances of Mr. Mayfield and his family, what extent do they bear on the facial challenge, if at all? Only as an example of what can happen, Your Honor. Only as an example. The government is only looking at part of the settlement when they say to you that we cannot get redress from either the district court or from this court. Your Honors, I specifically call the Court's attention to the fact that in paragraphs 24 and 25 of the amended complaint, which was the agreed-upon, bargained amended complaint, as Mr. McIntosh recited, we specify the relief that we seek. We state in paragraph 24 that we have demanded that the derivative materials be returned and that the government refuses to do it. And we ask in paragraph 25 for a declaratory judgment that the statutes under which this material was seized were unconstitutional. And if you look at paragraph C, Your Honor, subparagraph C of 25, we seek a declaration that this violation of the Fourth Amendment permits the Federal Government to covertly disseminate and retain information collected through these covert searches and electronic surveillance. Counsel, does that complaint survive the settlement? Yes. This is the complaint that was bargained for, Your Honor. This is the amended complaint that was filed as part of the settlement agreement. Your Honor, I served as co-counsel below also. What happened below is that Judge Aiken asked the parties on the record to pursue settlement. The parties pursued settlement. We agreed on damages. We agreed that the FISA take should be destroyed. We, the plaintiffs, demanded that the derivative materials be destroyed or quarantined in some way, and the government refused. That controversy was in the original complaint, and it carried over into the amended complaint. But it's one thing to ask for declaratory relief. It's also another thing to ask for injunctive relief or some sort of affirmative relief by the district court. And that is missing from the settlement agreement. The government said you may not have an injunction, you may not seek an injunction. That was part of the bargain. Right. And the other thing is that you may seek the declaratory relief contained in your amended complaint. The declaratory relief contained in the amended complaint is a declaration that all of this material was garnered illegally, rather unconstitutionally because of the change to FISA, and that it is a declaration that they cannot retain and disseminate these materials. So if the court ---- Including the derivative materials? Yes, Your Honor. That's paragraph 25C, Your Honor. And so if the court issues a declaration to that effect, we believe that the government under precedent, Utah v. Evans and the other cases that we cited, has an obligation to act in good faith and do what the court declares to solve the problem. So you read this ---- I didn't read it. I'll have to take a more careful look at it with your remarks. But you read this subparagraph C as saying that you were asking the district court for a declaration that the retention of this derivative material is unconstitutional. Yes. And I think Judge Aiken, although she didn't ---- She didn't do that. She didn't say that in the last two sentences. The statutes were unconstitutional, and that's it. Right. Although I think it's clear from the body of her opinion that that was her ---- that was what she thought she was doing. Well, if you read ---- the way I read her opinion was that she was suggesting, at least along this area of redressability, was that having entered a declaration that the statutes are unconstitutional, that the government, in its good graces, went on its own, segregate, destroy, do whatever, with respect to the derivative material. And then we hear the government today say we're not doing that. Right. Well, we asked for a declaration that retention and dissemination were inappropriate. This Court, as the government has pointed out, has de novo review of this declaratory judgment request. And, as we also pointed out under Section 2202 of the Declaratory Judgment Act, a trial court can issue appropriate orders to enforce its declaratory judgment. That leads it to Judge Aiken to say, on her own, to say, well, you know, I'm going to require the government to file a report or something or, you know, return something to me to indicate that they've destroyed the material. You can't, as I understand the settlement agreement, you can't go to her and say, Judge, do X, Y, and Z. I can go to her and I can go to Your Honors and say we asked for this relief in the complaint. There is not a redressability problem here. You may rule that we're wrong, that we don't have the right to cause these derivative materials to be destroyed. I think you could do that. But for the government to say that we have no standing because we didn't seek a remedy for the wrong that we couldn't settle with the government, that's simply not true. We would have been seeking a reasonable remedy with the understanding that if the declaration is issued. There is some legitimate concern, though, that you did settle the case. I mean, you settled a significant part of the case. Absolutely. I mean, there's no question, but at the beginning of the case, you could have sought both and you did, you sought both damages and I'm sure you sought injunctive relief as the case was getting off the ground. Yes, that was in the original complaint. And then as you move through the process, you settled a significant part of the case. It's not completely understandable. You know, nobody says anything about that. It's perfectly understandable. What bothers me as counsel below, involved in the settlement negotiations and today, is the fact that it was absolutely crystal clear what we were trying to accomplish. You know, this argument wasn't even made below by the lawyers that negotiated the settlement. This is an argument that has only been made here. And I ask the Court to give. As I read the settlement agreement that did preserve to the government the right to challenge jurisdiction. Yes, absolutely. Counsel, what the government wants to do is say you don't have standing in this case, correct? Correct. And you wanted to have standing. That was your bargain all along. Either way, you gave up the right for injunctive relief, did you not? Yes. I don't mean to tie you up on standing. It's important. It is important. And I want to be sure I satisfy your inquiries and that you have no other questions about this. I don't want this case to get derailed here, and I worry about it. I'll just have to take a closer look at the way you framed your request for relief. That's all. And I appreciate that. Are you planning to address the implications of Salerno? I wasn't planning on addressing the implications of Salerno. I'm happy to say to this Court that despite the fact that we feel that Salerno should be reexamined, and we said that in our in-bank petition, I understand that this Court probably will not do that unless we go in bank. Right. But we don't think Salerno is a problem at all, Your Honor. And I must contend with what Mr. McIntosh said here. Just because a particular case the government says, this person is an agent of a foreign power because we have probable cause that this person has committed a certain crime, that does not satisfy the Fourth Amendment, because in the context of the entire FISA statute, although the government must assert probable cause that a crime was committed, the government need not assert that there's probable cause, that evidence of the crime will be found in the places to be searched. There is a total, absolute lacking of Fourth Amendment probable cause particularity warrant requirement. But even under the prior manifestation of the statute, that requirement was not there. Correct. But it was okay if the primary purpose was foreign intelligence gathering. It's when the primary purpose ceases to be foreign intelligence gathering that these Fourth Amendment deficiencies become so significant to our thinking about what the Fourth Amendment means. You know, under the significant purpose test, Your Honor, the government could be having as a primary purpose criminal prosecution, which the Court in Keith said would be inappropriate. It could have something as base, Your Honor, as political espionage. I mean, during my legal career, we had a president, Nixon, an FBI director, Hoover, and an attorney general, Mitchell, that engineered under an alleged executive privilege what we call the Watergate break-in. Now, I only posit that to you, Your Honor, because the Fourth Amendment at its heart is designed to protect us against sovereign abuses. That's the purpose of it. Counsel, is it your view, then, if the primary purpose is to gather evidence of criminal activity, that it would still be within the significant purpose language of the statute? If I understand your question correctly, Your Honor, the answer is yes, that the government can very clearly, under this statute, and I think counsel conceded it, have as a primary purpose the prosecution of a person for a particular crime, and the government justifies that by saying the end justifies the mean. The end may be a bargaining chip with Venezuela over somebody who's in prison, but, Your Honor, the Fourth Amendment has always been the end and the means. The Fourth Amendment is not absolute. Of course. Reasonableness. Of course. Is the essence of the Fourth Amendment. The way I've read the case is the court talks about the warrant clause, and the court talks about the reasonableness clause. And what has happened here is that the warrant clause is being invaded. What has happened here is that for the first time in the history of our country, the executive department can have as its primary purpose domestic political surveillance, criminal prosecution, and in good faith can go to the FISA court and say, well, a significant purpose is foreign intelligence gathering, and not even voice what its primary purpose is. But any purpose other than foreign intelligence gathering as a primary purpose blows apart this very limited exception to the Fourth Amendment. In our brief, I called it the nose in the tent. When the government argued the Keith case, the government said, of course, the only reason for this surveillance and the only reason it's justified is for intelligence gathering. Counsel, what's your understanding of the holding in Salerno? That in a facial challenge, Your Honor, all possible applications of the statute must be unconstitutional for a facial challenge to survive. Very difficult. Extremely difficult. And it's your position that you can meet that difficult standard in this case? Yes, because on its face, Your Honor, on its face, the way FISA is now written, the Fourth Amendment procedural safeguards when the government is involved in criminal prosecution are not met. They simply are not met. So you can't think of one set of circumstances under which the act would be valid. That's your position. Yes, Your Honor. That's what Salerno requires. That's correct, Your Honor. I mean, let me give an example. Suppose the city of Portland said, we've got a problem with people doing marijuana in their bathrooms. It's a big problem. We've got a lot of marijuana growing in the city of Portland. We're going to pass an ordinance that says police can go into any house to look for marijuana growing in the bathroom and prosecute those people. Well, certainly sometimes the government would have probable cause, but the statute on its face does not meet Fourth Amendment requirements. That's what we have here. On its face, the government can go to the FISA court. That's only if you equate probable cause as it's been interpreted in the context of traditional criminal prosecutions. But the statute is not written that way. And the question becomes whether or not there is one set of circumstances under which this statute would be validly applied. If there were a classic foreign sale that was plotting against the government and this statute were applied, would you say that the statute was unconstitutionally applied in that circumstance? Because although the government may have as a primary purpose foreign intelligence gathering, the statute says that the government only has to have a significant purpose. Now, could the government come in, in my hypothetical case, and go to a judge and say we have probable cause, we've seen marijuana going in and out of the house, and get probable cause? Yes. But that wouldn't make the statute on its face constitutional. The statute on its face provides for a lack of probable cause that a crime was committed in many circumstances, and in the few circumstances where there is probable cause that a crime was committed, the statute on its face does not require the particularity and the notice and the duration requirements that have been handed down through thousands of court decisions in interpreting the Fourth Amendment. I appreciate, Your Honor, as much as anyone does, that if there's a ticking bomb scenario like we see on TV, that the government needs to act quickly. All that the statute needs to do to be fixed is to go back to primary purpose so that the government simply goes to the FISA court and says our primary purpose is gathering foreign intelligence. Then it's constitutional in our opinion. But under the current setup, where the government never has to do that, didn't do it in this case by stipulation, and even when it shows probable cause, gets a warrant that is more akin to a general warrant, which is one of the things we fought the revolution over. Under FISA... What do you think that Congress was trying to accomplish with the change? You know, they passed another section which took down the wall, and we're not challenging that other section as cited in our brief, I think it's 1806. I think, Your Honor, as I said in the brief, that in the emotional turmoil following 9-11, as has happened other times in our history, we forgot about bedrock principles in order to do what the executive said needed to be done. I think that's what happened. They need to make that modification in order to implement removing the so-called wall? No, absolutely not. And it has always been the case, as Mr. McIntosh acknowledged, that if they discovered evidence of a crime during a foreign intelligence tap, that they could prosecute the person. Section 1806, which is in our brief, eliminates the wall. The wall is a red herring in this case, Your Honor. You've got a few minutes left. You've got about a minute left. Go ahead and summarize. Is there anything else that you would like to talk about rather than what I want to talk about? Judge Rollinson, would you like to talk any more about the probable cause issue? I'm satisfied with your responses. Thank you. Well, if you want to pursue it further, you know, one of the arguments the government advances is the programmatic exception to the warrant requirements. And if the programmatic – And that is – and taking their argument here is that the FISA structure, the elements of the FISA scheme, statutory scheme, is all that's – you know, they have to go to the FISA court, they have to have certification, they have to meet certain standards, that in the area – in the realm of foreign intelligence, this is just another example or another situation where it's a programmatic effort that is similar to other programmatic schemes that the court – That's the government's argument. And our argument is Edmund's. Our argument is Edmund's, where the court said in this – Well, I appreciate the opportunity, Your Honor, to talk with you about something which really goes to the core of why this building is here and why the Fourth Amendment is on the wall outside. Thank you.   I'm sure the government would agree with that, correct? We – absolutely, Your Honor. Just a few points. As far as the theme of taking down the wall, Mr. Rosenthal is correct that there are – there is another statutory provision which is also designed, and this is in 1806K, I believe, to help take down the wall. But the fact remains that the reason the wall went up in the first place was the judicial adoption of the primary purpose test, and it was imperative for Congress as a statutory matter to take a step toward taking that back in order to help the wall come down. Mr. Rosenthal has mentioned a number of other features of the statute, the notice provisions, the duration provisions, the particularity provisions. All those provisions have been upheld by other courts, but perhaps equally to the point, none of those provisions are within the scope of the complaint you have in front of you. If you read the complaint, it's extremely specific about what the defects – the constitutional defects are. You'll see no reference to the duration provision, no reference to particularity, no reference to suppression provisions, no reference to any of those provisions. Those are matters for another day and another case. You're saying the judge below went too far when they went on those areas? Yes, absolutely, Your Honor. And, indeed, a number of those provisions, for example, the 120-day duration provision for non – when it's a non-U.S. person as a target, they don't even apply to United States persons. So the Mayfields, even if there were no other problems in the case, wouldn't have standing to raise them. And there are other parts of the statute. They're just not part of this case. I just have one question for you, and that is counsel made a reference to the complaint. Yes, Your Honor. Almost down to the paragraph 25, subdivision C. Yes. I didn't want to speak to that, Your Honor. What's your response to that? I have a different reading of that, Your Honor. I think if you look at – I'll just read it through. This is C. Permit the government to covertly collect, disseminate, and retain information collected through covert physical searches and electronic surveillance. I understand that, Your Honor, to refer to the take, not to anything that might be derivative. For example, if the government conducts surveillance, and that leads to an interview with someone, which leads to an interview with someone else, which leads to some other evidence gathering, that's derivative material, but that's not within the scope of what's being discussed here in C. That's not information collected through covert physical searches and surveillance. Counsel, could you respond to opposing counsel's position that no set of circumstances exist under which this statute can be construed as constitutional? In our view, Your Honor, on this case, in virtually all circumstances it's constitutional, but certainly in any number of cases it is. That's true as to the primary – pardon me – the probable cause standard that's at the heart of the complaint. It's true as to the other provisions they've mentioned. As I said, those provisions really aren't in the scope of the complaint. They're not really before the court. But just to take one for example, probable cause to believe that evidence of a crime will be found. Now, there are going to be cases where it's perfectly legitimate for the government to conduct surveillance of a facility being used by foreign powers or agents of foreign powers, even if there's no particular reason to think that criminal evidence will be turned up. For example, if a foreign terrorist group is considering an attack on nuclear facilities in the United States, it might engage in non-criminal information gathering, casing activities, that don't themselves constitute a crime. And the product of that kind of non-criminal turning up of information might well be discussed in the course of conversations between members of the group. Now, is that evidence of a crime in and of itself? Not necessarily. The fact that somebody was surfing the Internet trying to find information about locations of nuclear power plants, but it's still perfectly legitimate for the government to conduct that kind of surveillance to figure out what they're trying to accomplish. I understand. Thank you, Your Honor. Thank you, counsel. We appreciate arguments from both sides. It's an interesting case, and we will submit the matter now at this time. Thank you all very much. And that ends our session for today.
judges: Paez, Rawlinson, Collins